Filed 12/15/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARIA GARCIA, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KND DEVELOPMENT 52, LLC, et al., <br><br> Defendants and Appellants. | B301929 <br><br> (Los Angeles County Super. Ct. No. BC718221) |

APPEAL from an order of the Superior Court of Los Angeles County, Peter A. Hernandez, Judge.  Affirmed.

Law Offices of Samer Habbas & Associates, Samer Habbas and Adam Kocaj, for Plaintiff and Respondent.

Giovanniello Law Group, Alexander F. Giovanniello and Thomas C. Swann, for Defendants and Appellants.

---

## INTRODUCTION

Appellants KND Development 52, LLC and THC-Orange County, LLC (Kindred Hospital Baldwin Park and Kindred Hospital Los Angeles, respectively) appeal from the trial court's order denying their petition to compel arbitration of a lawsuit brought by respondent Maria Garcia, individually and as successor in interest to her deceased husband, Ramiro Garcia, regarding Ramiro's treatment at appellants' hospitals.[1]  During or soon after the process of Ramiro's admission as a patient at Kindred Hospital Baldwin Park, Ramiro's son, Mike Garcia, signed an arbitration agreement, purportedly on Ramiro's behalf. Maria did the same at Kindred Hospital Los Angeles.  Mike and Maria also signed other documents during or soon after Ramiro's admission.  Following Ramiro's death, allegedly caused by appellants' staff, Maria sued appellants for negligence (in her capacity as Ramiro's successor in interest) and wrongful death.

Appellants filed a petition to compel arbitration pursuant to the arbitration agreements Mike and Maria had executed.  They argued Ramiro had conferred ostensible

---

[1]     Because the members of the Garcia family share a surname, we refer to them by their first names to avoid confusion.

2

authority on Mike and Maria to execute the arbitration agreements on his behalf, relying on declarations executed by (1) the supervisor of the employee who signed the Baldwin Park agreement, and (2) the employee who signed the Los Angeles agreement. The Baldwin Park supervisor did not claim to have interacted with Ramiro, and the Los Angeles employee had no recollection of any interaction with him. Each declarant inferred from the arbitration agreements and her understanding of the admission process that Ramiro had nodded or shook his head in a manner authorizing the execution of the arbitration agreements on his behalf. Their inferences were contradicted by Mike and Maria, who submitted declarations in opposition to the petition. After a hearing, the trial court found appellants failed to produce sufficient evidence that Ramiro had authorized Mike and Maria to execute the arbitration agreements on his behalf. The court therefore concluded appellants failed to meet their burden to establish the existence of an enforceable arbitration agreement, and denied their petition to compel arbitration.

On appeal, appellants contend the trial court discriminated against arbitration contracts, in violation of the Federal Arbitration Act (FAA), in denying their petition to enforce the arbitration agreements signed by Mike and Maria. They fault the court for holding them to an evidentiary burden to show Ramiro authorized the execution of the arbitration agreements without questioning the validity of the other documents signed by Mike and Maria

during or soon after Ramiro's admission (the validity of which was not at issue on appellants' petition).

We affirm. Substantial evidence supported the trial court's conclusion that appellants failed to meet their burden to establish the existence of an enforceable arbitration agreement. In reaching that conclusion, the court relied on generally applicable law conditioning the validity of an arbitration agreement executed by a purported agent -- like any other contract executed by a purported agent -- on an adequate evidentiary showing that the agreement falls within the scope of authority, if any, conferred by the principal. The court did not apply this law in a fashion disfavoring arbitration contracts, and thus did not violate the FAA.

## FACTUAL BACKGROUND
### A. *Ramiro's and Maria's Complaints*

Ramiro presented for treatment at Kindred Hospital Baldwin Park on February 9, 2018. In April 2018, he was transferred to a third-party hospital, where he received surgery for gallbladder stones. On May 25, 2018, he presented for rehabilitation services at Kindred Hospital Los Angeles. Three days later (on May 28, 2018), he was transferred back to Kindred Hospital Baldwin Park. In August 2018, Ramiro sued appellants, alleging that their staff failed to properly turn him in his hospital beds, causing him to develop pressure sores. He raised the following causes of action: (1) negligent retention, supervision, and

4

training; (2) negligence; and (3) violation of the Elder Abuse and Dependent Adult Civil Protection Act, Welfare and Institutions Code section 15600 et seq.

In December 2018, appellants filed a petition to compel arbitration. In January 2019, before any response to the petition was filed, the parties filed a stipulation that Ramiro had recently died, that the petition was withdrawn, and that an amended complaint (attached as an exhibit) would be filed. The amended complaint, filed in February 2019, was largely identical to the original complaint, but specified that Ramiro's claims were now being brought through his widow Maria as his successor in interest, and added a wrongful death claim brought by Maria personally.

### B. *Appellants' Petition*

On March 25, 2019, appellants filed a new petition to compel arbitration. They relied on two arbitration agreements: (1) a February 10, 2018 "Voluntary Alternative Dispute Resolution (ADR) Agreement," signed by Ashley Tirado on behalf of Kindred Hospital Baldwin Park, and by Ramiro's son Mike as Ramiro's purported "Legal Representative"; and (2) a May 26, 2018 agreement of the same kind, signed by Iris Trapp on behalf of Kindred Hospital Los Angeles, and by Maria as Ramiro's purported legal representative. Each agreement stated at the outset (in italics) that signing was "not a precondition to the furnishing of services," and stated at the end (in boldface), "Please remember, this Agreement is optional."

Appellants concurrently filed a declaration executed by Christine Saltonstall, the chief financial officer of Kindred Hospital Baldwin Park. Saltonstall declared she was the direct supervisor of Tirado, the Admitting Associate who signed the Baldwin Park arbitration agreement. She further declared that she was familiar with Tirado's custom, habit, and practice, and that she had no reason to believe Tirado had deviated from them when interacting with Ramiro. She stated Tirado would present the admission documents, including the arbitration agreement, to each patient or patient's authorized representative, and explain the documents "if requested." She indicated that Tirado would approach the patient's next of kin as an authorized representative only if the patient first declined to personally execute the admission documents and "affirmatively state[d] with a nodding or shaking of the head that the next of kin ha[d] authority to execute the admission paperwork . . . ." Based on her familiarity with Tirado's custom, habit, and practice, and her review of specified documents, Saltonstall declared, "it is clear [Ramiro] gave his son, Mike Garcia, authority to execute the admission paperwork."

Appellants also submitted a similar declaration executed by Trapp, the Kindred Hospital Los Angeles receptionist who signed the Los Angeles arbitration agreement on the hospital's behalf. Trapp declared she "d[id] not specifically recall the circumstances surrounding the execution" of the agreement. She therefore relied on her custom, habit, and practice, which she described much as

6

Saltonstall described Tirado's custom, habit, and practice (e.g., she identified the arbitration agreement as one of the admission documents she would present to each patient or patient's authorized representative and, "if requested," explain). She declared, "Again, while I do not recall the specifics regarding [Ramiro], it is my custom, habit and practice, to only approach the next of kin if the patient responded in the affirmative. Here, because the admission documents contain the signature of [Ramiro]'s wife, Maria Garcia, it is clear that [Ramiro], through a nodding or shaking of the head, gave me authority to contact Ms. Garcia for this purpose."

In their brief in support of the petition, appellants relied on Saltonstall's and Trapp's declarations to argue Ramiro had authorized Mike and Maria to execute the arbitration agreements on his behalf. They further argued, "[B]ecause Plaintiffs accept the proposition that both Mike and Maria Garcia had the authority to execute the various admission documents that now form the basis of this litigation, Plaintiffs are also required to accept that both individuals had the authority to execute the ADR Agreements." They relied on *Kindred Nursing Centers Ltd. Partnership v. Clark* (2017) 137 S.Ct. 1421 (*Kindred*), asserting *Kindred* "makes clear that if the agent had authority to execute some contracts, the agent had authority to execute all contracts."

### C. *Maria's Opposition and Appellants' Reply*

In opposing appellants' petition, Maria argued, inter alia, that appellants had failed to meet their burden to establish the existence of an enforceable arbitration agreement, as they had failed to produce evidence that Ramiro had authorized Mike and Maria to execute the arbitration agreements on his behalf. Maria relied, inter alia, on *Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581 (*Flores*), which she described as "directly on point."[2]

Maria concurrently submitted declarations executed by Mike and herself. Mike and Maria expressly contradicted

---

[2]    In *Flores*, as part of the process of admitting a patient into a skilled nursing facility, the patient's husband signed various documents, including two arbitration agreements. (*Flores*, *supra*, 148 Cal.App.4th at 585.) The husband did not hold a power of attorney, but signed the arbitration agreements as the patient's purported agent. (*Ibid.*) The patient and her husband later sued the facility, which filed a petition to compel arbitration. (*Id.* at 585-586.) The trial court denied the petition on the ground that the facility had failed to present evidence that the patient had engaged in any conduct causing the facility to believe her husband had authority to execute the arbitration agreements on her behalf. (*Id.* at 586) The Court of Appeal affirmed, holding the facility had failed to meet its "burden to show the validity of the arbitration agreement based on [the patient's] express or implied consent to have her husband act as her agent." (*Id.* at 589.) The court held insufficient the mere fact that the husband signed the arbitration agreement during the admission process, in the absence of evidence that the patient engaged in conduct manifesting consent to the signing on her behalf. (*Id.* at 588.)

Saltonstall and Trapp, respectively, asserting that the factual scenarios inferred by Saltonstall and Trapp did not occur. Mike declared he was asked to sign documents on Ramiro's behalf a day after Ramiro had been admitted to Kindred Hospital Baldwin Park and had begun receiving care. He further declared he had no recollection of any agent of the hospital calling his attention to the arbitration agreement or explaining its significance. Finally, he declared, "I never represented to anyone at Kindred Hospital Baldwin Park that I was authorized to execute documents on behalf of my father. As well, at no time did my father make representations to Kindred Hospital Baldwin Park that I was authorized to execute documents on his behalf." Maria's declaration was nearly identical with respect to the events at Kindred Hospital Los Angeles.

In their reply brief, appellants again failed to identify any evidence, aside from Saltonstall's and Trapp's declarations, that Ramiro had authorized Mike and Maria to execute the arbitration agreements on his behalf. They did not address Maria's reliance on *Flores*.

### D. *Hearing and Ruling*

At the August 14, 2019 hearing on the petition, the trial court noted it had issued a tentative ruling denying the petition and, after briefly hearing argument from appellants' counsel, asked him to identify evidence of Ramiro's consent to Mike's and Maria's execution of the arbitration agreements on his behalf. Appellant's counsel argued that

9

at each hospital, Ramiro "gave a head nod or head shake to indicate . . . that his next of kin was authorized to sign" the documents "within the admission packet," including the arbitration agreements.  Maria's counsel argued:  (1) appellants' evidence was insufficient to establish that Ramiro nodded or shook his head; and (2) even assuming Ramiro nodded or shook his head in a manner manifesting consent to the execution of some of the documents in the admission packet, appellants' evidence was insufficient to show he thereby also manifested consent to the execution of the arbitration agreements.

The court adopted its tentative ruling denying the petition on the ground that appellants had failed to meet their burden to prove the existence of a valid arbitration agreement, as they had produced insufficient evidence that Mike and Maria had authority to execute the arbitration agreements on Ramiro's behalf.  In its written ruling, the court stated the facts in this case "fall directly within" the legal principles applied in *Flores*.  The court found insufficient the evidence that Mike and Maria signed the agreements as Ramiro's purported representatives because "agency cannot be created by the conduct of the agent alone; instead, conduct by the principal is essential to create the agency."  The court further reasoned, "There is no evidence in Defendants' motion that demonstrates that [Ramiro] had agreed to provide a health care durable power of attorney to either [Maria], his son or anyone else.  The closest that Defendants come to demonstrate this is the assertion that

10

[Ramiro] may have indicated that he wished [Maria] [to] fill out the admission documents through nodding or shaking his head.  (*See Trapp Decl.*, ¶ 5.)  However, nowhere do Defendants indicate that they told [Ramiro], through their agents, that one of these documents would be a voluntary ADR agreement or that [Ramiro] understood what a voluntary ADR agreement entailed."

Appellants timely appealed the order denying their petition.

## DISCUSSION

Appellants contend the trial court discriminated against arbitration contracts, in violation of the FAA, in denying their petition to enforce the arbitration agreements signed by Mike and Maria.

### A. *Principles*

"'The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement.'"  (*Lopez v. Bartlett Care Center, LLC* (2019) 39 Cal.App.5th 311, 317 (*Lopez*).)  "'Even the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized [an agent] to act for them in executing such an agreement.'"  (*Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1128 (*Young*).)  "'[A]n agency cannot be created by the conduct of the agent alone; rather, *conduct by the principal* is essential to create the agency.'"  (*Lopez*,

11

*supra*, at 318; see also Civ. Code, § 2315 ["An agent has such authority as the principal, actually or ostensibly, confers upon him"]; *id.*, § 2316 ["Actual authority is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess"]; *id.*, § 2317 ["Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess"].)  A person who chooses to pursue a contract with a principal through a purported agent "takes the risk not only of ascertaining whether the person with whom he is dealing is the agent, but also of ascertaining the scope of his powers."  (*Young, supra*, at 1134.)

The FAA "requires courts to place arbitration agreements "'on equal footing with all other contracts.'"  (*Kindred, supra*, 137 S.Ct. at 1424.)  Any state law rule that "singles out arbitration agreements for disfavored treatment" violates the FAA.  (*Ibid.*)  "The FAA thus preempts any state rule discriminating on its face against arbitration . . . [and] also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements."  (*Id.* at 1426.)  But a court may "invalidate an arbitration agreement based on 'generally applicable contract defenses'" without violating the FAA, so long as it does not apply a generally applicable defense "'in a fashion that disfavors arbitration.'"  (*Id.* at 1426, 1428.)

We review de novo the legal conclusions underlying a trial court's denial of a petition to compel arbitration. (*Lopez, supra,* 39 Cal.App.5th at 317.) We review the court's factual conclusions under the substantial evidence standard. (*Ibid.*) Under that standard, "when the trier of fact has expressly or implicitly concluded the party with the burden of proof did not carry the burden and that party appeals, . . . "'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.""" (*Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc.* (2018) 19 Cal.App.5th 258, 270.)

### B. *Analysis*

Substantial evidence supported the trial court's conclusion that appellants failed to meet their burden to show that Ramiro, through his conduct, conferred authority on Mike and Maria to execute the arbitration agreements on his behalf. Appellants' evidence of Ramiro's conduct consisted solely of the declarations executed by Saltontsall and Trapp, which met neither of the two standards necessary to compel a finding in appellants' favor as a matter of law. (See *Patricia A. Murray Dental Corp. v. Dentsply Internat., Inc., supra,* 19 Cal.App.5th at 270.) First,

13

the evidence was contradicted; Mike and Maria declared that the factual scenarios inferred by Saltonstall and Trapp did not occur, and that Ramiro made no representations to appellants' agents that Mike and Maria were authorized to execute documents on his behalf. Second, even disregarding contrary evidence, Saltonstall's and Trapp's declarations lacked the character and weight necessary to leave no room for a judicial determination that they were insufficient. Saltonstall did not claim to have interacted with Ramiro, and Trapp had no recollection of any interaction with him. Thus, to the extent the declarations constituted evidence of Ramiro's conduct, they were based on inferences derived solely from documents and the declarants' asserted understanding of how such documents were typically executed. The court was not compelled, as a matter of law, to accept those inferences about Ramiro's conduct.[3] (See *Young*, *supra*, 220 Cal.App.4th at 1134 [trial court was entitled to reject as insufficient declaration of admission coordinator, based on her "'custom and practice,'" that she

---

[3]  Contrary to appellants' implication, the court made no finding that Ramiro nodded or shook his head in a manner authorizing Mike and Maria to execute the non-arbitration documents in the admission packet (the validity of which was not at issue). The court merely observed that Trapp's "assertion" that Ramiro "may" have nodded or shook his head was the evidence that came "closest" to showing Ramiro had conferred authority comparable to a health care durable power of attorney. The court's phrasing implied a finding that none of appellant's evidence showed Ramiro had conferred such authority.

"'would have'" confirmed with patient that patient's daughter had authority to sign arbitration agreement on patient's behalf].)

As the trial court recognized, *Flores* is on point. (See *Flores*, *supra*, 148 Cal.App.4th at 585-589 [trial court properly denied skilled nursing facility's petition to compel arbitration, notwithstanding patient's husband's execution of arbitration agreements during admission process, where facility failed to meet its burden to show patient had engaged in conduct causing facility to believe her husband had authority to execute arbitration agreements].) More recent cases, decided on similar facts, also support the court's conclusion. (See *Young*, *supra*, 220 Cal.App.4th at 1133 [following *Flores*; "appellants offer nothing to suggest that plaintiff acted in any way to cause the facility's admission coordinator to believe that plaintiff's daughter was authorized to sign an arbitration agreement on plaintiff's behalf"]; *Lopez*, *supra*, 39 Cal.App.5th at 317-320 [substantial evidence supported trial court's finding that patient's daughter lacked authority to execute arbitration agreement on patient's behalf, where daughter contradicted skilled nursing facility's evidence that patient verbally authorized her to sign and that she signed in patient's presence].)

Appellants address the foregoing caselaw only by implication, arguing that *Kindred*, *supra*, 137 S.Ct. 1421, established that the FAA preempts the state law on which *Flores* and related cases relied. Not so.

In *Kindred*, the United States Supreme Court reviewed the Kentucky Supreme Court's decision in two consolidated cases, *Clark* and *Wellner*. (*Kindred, supra,* 137 S.Ct. at 1425.) Each case involved an arbitration agreement executed on behalf of a nursing home patient as part of the process of "complet[ing] all necessary paperwork" for admission, by a family member who held a power of attorney affording her "broad authority to manage [the patient's] affairs." (*Ibid.*) The Kentucky Supreme Court held that the *Wellner* power of attorney was "insufficiently broad" to give the agent the authority to execute an arbitration agreement. (*Id.* at 1429.)[4] Though the court held that the *Clark* power of attorney, in contrast, was "sufficiently broad to cover executing an arbitration agreement," it nevertheless invalidated the *Clark* arbitration agreement pursuant to a newly devised "clear-statement rule," under which a power of attorney could not authorize execution of an arbitration agreement unless it expressly referred to the waiver of the principal's rights of access to the courts and to trial by jury. (*Id.* at 1425-1426, 1429.)

The United States Supreme Court held that this clear-statement rule was "too tailor-made to arbitration agreements -- subjecting them, by virtue of their defining trait, to uncommon barriers -- to survive the FAA's edict

---

[4] The *Wellner* power of attorney authorized the agent to, inter alia, "'institute legal proceedings' and make 'contracts of every nature in relation to both real and personal property.'" (*Kindred, supra,* 137 S.Ct. at 1425.)

against singling out those contracts for disfavored treatment." (*Kindred*, *supra*, 137 S.Ct. at 1427.) The court therefore reversed the judgment in the *Clark* case, which was "exclusively" based on the clear-statement rule. (*Id.* at 1429.) However, rather than reverse the judgment in the *Wellner* case, the court instructed the Kentucky Supreme Court to determine, on remand, whether the clear-statement rule had influenced its prior interpretation of the *Wellner* power of attorney as insufficiently broad to authorize the agent to execute an arbitration agreement. (*Ibid*.) The court noted, "If that interpretation of the document is wholly independent of the [Kentucky Supreme Court's] clear-statement rule, then nothing we have said disturbs it." (*Ibid.*) On remand, the Kentucky Supreme Court adhered to its prior conclusion that the *Wellner* power of attorney did not confer authority to execute an arbitration agreement, explaining it had reached this conclusion wholly independently of the clear-statement rule. (*Kindred Nursing Centers Limited Partnership v. Wellner* (Ky. 2017) 533 S.W.3d 189, 194.) The United States Supreme Court denied review. (*Kindred Nursing Centers Ltd. Partnership v. Wellner* (2018) 139 S.Ct. 319.)

As shown by its disposition in the *Wellner* case, the Supreme Court has recognized that the FAA does not preempt generally applicable state law conditioning the validity of an arbitration agreement executed by a purported agent -- like any other contract executed by a purported agent -- on an adequate evidentiary showing that the

17

agreement falls within the scope of authority, if any, conferred by the principal. Here, the trial court relied on such generally applicable law. It neither articulated nor implied any requirement applicable only to arbitration contracts, or to contracts sharing their defining traits. We cannot infer discrimination from the mere fact that the court's ruling was limited to appellants' arbitration agreements, as only those agreements were at issue on appellants' petition. Appellants identify no evidence that the court would have reached a different conclusion had they sought, on a similar evidentiary showing, to compel enforcement of a contract of a different nature. In sum, the court's conclusion was supported by substantial evidence and consistent with the FAA.

**DISPOSITION**

The order is affirmed.  Maria is entitled to her costs on appeal.

**CERTIFIED FOR PUBLICATION**


MANELLA, P. J.



We concur:



WILLHITE, J.



COLLINS, J.